IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs September 1, 2020

## STATE OF TENNESSEE v. NICHOLAS BROOKS

**Direct Appeal from the Criminal Court for Shelby County**
No. 17-05802    Chris B. Craft, Judge

### No. W2019-01802-CCA-R3-CD

A Shelby County jury convicted the Defendant, Nicholas Brooks, of first degree felony murder in perpetration of a robbery, first degree felony murder in perpetration of a burglary, especially aggravated robbery, aggravated burglary, and employing a firearm during the commission of a dangerous felony. The trial court sentenced him to an effective sentence of life plus twelve years. On appeal, the Defendant contends that: (1) the trial court erred when it admitted the Defendant's mother's statement into evidence; (2) the trial court improperly instructed the jury; and (3) the evidence at trial was insufficient to support his convictions. After a thorough review of the record and the applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Claiborne H. Ferguson and Chloe P. Hawes (at trial) and Ramon Damas (on appeal), Memphis, Tennessee, for the appellant, Nicholas Brooks.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; Karen Cook and Jose F. Leon, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the armed robbery of the victim's, Christopher Waters, home, during which the intruders killed the victim and took multiple items belonging to the victim, including his car. For these crimes, a Shelby County grand jury indicted the Defendant for first degree felony murder in perpetration of a robbery, first degree felony

murder in perpetration of a burglary, especially aggravated robbery, aggravated burglary, and employing a firearm during the commission of a dangerous felony.

## A. Trial

The parties presented the following evidence at the Defendant's trial: The victim's mother, Lisa Waters, testified that he was thirty years old when he was murdered. The victim was a school teacher in the Memphis City School System where he taught orchestra and violin. Ms. Waters visited the victim often at the home he owned in Memphis. The victim also owned a vehicle, an orange 2016 T-Top Mustang. Ms. Waters attended a party in February of 2016 at the victim's home to celebrate his purchase of the house and his vehicle.

Vernon Fant, the victim's supervisor, testified that he was an art and music teacher in Memphis. Mr. Fant testified that he was familiar with the victim's handwriting and would recognize it. Mr. Fant identified a photo of the victim's handwriting, as well as a photo of the victim's orange Mustang.

Mr. Fant testified that the last time he saw the victim was on a Thursday, and the victim did not come to work the next day, Friday, December 9, 2016. Mr. Fant knew that the victim had a music "gig" the night before. Mr. Fant recalled that the victim was late for school and had not contacted Mr. Fant to say he would be late, which was unusual. The school asked Mr. Fant and another colleague to go to the victim's house to check on the victim. Mr. Fant had attended the victim's housewarming party and therefore knew where the victim lived.

Mr. Fant and his colleague, Rashad Weathers, went to check on the victim. When they arrived at the victim's home, they noticed that the victim's orange Mustang was not there and one of the glass doors on the house was smashed. This raised their suspicions, and, after getting no answer when calling out for the victim and calling his cell phone, the two men went inside the victim's home.

Once inside the home, the men saw that there was writing on the wall and a missing television from the kitchen and a television on the floor in the den. The men noticed that the victim's bedroom door was closed; they noticed a blood stain on the door and then decided to call the police. Before the police arrived, the two men decided to open the bedroom door, and inside, they discovered the victim's body on the floor, naked from the waist down. They immediately ran out of the house. In the victim's driveway, the men noticed loose change on the ground, which they found to be strange.

Mr. Fant testified about the messages written on the wall of the victim's home,

which had not been there previously. Mr. Fant identified photographs of the messages on the walls, where "Suicide" and "Nobody did this but me, cHristopher Waters," was written. Mr. Fant noted that the victim's name was misspelled in the message. He did not think the writing looked like the victim's, and he found it odd that the victim's name was printed as "cHristopher." Mr. Fant stated that capitalizing the second letter of his name was not consistent with the way the victim wrote.

The police arrived after Mr. Fant and his colleague had run out of the house. The men stood outside and spoke with the police for a long time, and, while doing so, they saw the victim's car drive up the street. Mr. Fant immediately told the police that he had seen the victim's car.

Officer Theresa Carlson of the Memphis Police Department ("MPD") testified that on December 9, 2016, she heard a call over police dispatch about officers responding to the victim's home. As she pulled up to the victim's residence, another officer advised her that an orange Mustang, matching the description of the one taken during the robbery, had just driven by. Officer Carlson pursued the vehicle and initiated a traffic stop of the orange Mustang. Officer Carlson activated her body camera before she exited her vehicle. The State played the camera footage, although it is not included in the record on appeal. Officer Carlson testified that the recording showed her stopping the orange Mustang; the Defendant exited the vehicle and walked towards a house. Officer Carlson called to the Defendant to stop, but he did not comply. Officer Carlson testified that she eventually detained the Defendant, and he provided the name "Joseph Smith" as his own. She ran the tag number for the orange Mustang through the vehicle information system and the tag came back as registered to the victim; the papers in the vehicle also had the victim's name on them. Officer Carlson identified the Defendant in the courtroom as the driver of the orange Mustang. Officers took the Defendant into custody later that day.

Officer Eric Hutchison of the MPD testified that he performed a gunshot residue test on the Defendant. The test revealed the presence of gunshot residue on the Defendant's face, which Officer Hutchison testified indicated that the Defendant was very close to a weapon when it was fired.

Stacy Milligan testified that he worked for the MPD as a crime scene investigator at the time of this crime and responded to the call at the victim's residence. Officer Milligan identified photographs he had taken at the crime scene and of evidence found; one of the photos was of the loose change found in the driveway, which contained a unique coin. He also identified a .40 caliber bullet shell casing that was collected from the victim's residence, as well as a butcher knife found in the victim's bedroom. Officer Milligan identified an empty liquor bottle found in the bar of the residence. He testified that the residence appeared to have been ransacked. Officer Milligan identified several

3

photographs of blood stains on the walls and doors. Officer Milligan identified a "Masonic ring" found in the driveway of the residence.

On cross-examination, Officer Milligan said that, when he saw the victim's body, the body was naked from the waist down.

Travis Horn testified that he had previously employed the Defendant to work in his restaurant. Mr. Horn testified that he and the Defendant had a disagreement and "parted ways" in 2015. Mr. Horn was shown a photograph of some of the writing on the wall inside the victim's residence; he identified his name written on the wall and stated that it was misspelled. He testified that it was not his handwriting, and he had not written it or seen the writings before. Mr. Horn testified that he did not know the victim and had never been to his home. Mr. Horn reiterated that he and the Defendant had not "parted ways" amicably.

On cross-examination, Mr. Horn denied "hanging out" with the Defendant but reiterated that he employed the Defendant to work at his restaurant. Mr. Horn identified a photograph of the Masonic ring found in the driveway and stated that he had seen the Defendant wearing the ring in the past.

John Stone testified that he worked as a crime scene investigator for the MPD and processed the evidence collected at the victim's residence. Sergeant Stone identified an empty liquor bottle found inside the victim's residence, which he dusted for fingerprints and checked for DNA. He identified several more bottles of alcohol that were collected from the victim's residence that were checked for fingerprints and DNA.

Multiple MPD officers testified about the evidence in this case. In addition to finding the Defendant's fingerprints in the victim's vehicle and on the vehicle's gas cap, an officer found the Defendant's fingerprints on a liquor bottle that officers collected from the victim's home.

Dr. Katrina Vanpelt testified as an expert in the field of forensic medical pathology. Dr. Vanpelt was shown the victim's autopsy report, prepared by Dr. Marco Ross, who conducted the autopsy. According to the report, Dr. Ross examined the victim's body and identified gunshot wounds to his neck and hand as well as three stab wounds to his torso. Dr. Ross described the gunshot wound to the neck as fatal. Dr. Vanpelt testified that the victim's wound to the neck was survivable with medical attention. She stated that the manner of death was homicide.

Officer Billy Byrd testified that he worked in the MPD homicide unit and investigated the victim's death. As part of his investigation, he executed a search warrant

at a residence and found the Defendant in one of the bedrooms. Officer Byrd obtained certain items of evidence from the bedroom in which the Defendant was found, including the keys to the victim's orange Mustang. The Defendant did not exhibit any signs of injury.

Lieutenant Eric Kelly testified that he worked in the homicide unit at MPD and interviewed the Defendant on December 9, 2016. The Defendant claimed to have an injury but none was visible to Lieutenant Kelly. Lieutenant Kelly issued the requisite *Miranda* warnings, and the Defendant signed a waiver of rights form. During the interview, the Defendant handwrote a statement, which the State showed to the jury.

In his statement, the Defendant admitted calling the victim on the night of the murder and making plans to go to the victim's residence for the purpose of getting money for the Defendant's friend, "Mac." With "Mac" and two other men, the Defendant went to the victim's house and called the victim, asking him to let them inside. The victim invited the Defendant inside and, once the two men were together inside the victim's bedroom, the victim asked the Defendant to get in bed with him. The Defendant declined to do so, and then he heard "Mac" and the other men begin to break down the victim's door to enter the residence. The Defendant and the victim attempted to bar the bedroom door to keep the men out. The Defendant stated that he was "hit with a small gun." The other men then began "ransacking" the victim's home and asking the victim where his money was kept. The other men then robbed the Defendant of his belongings, including his wallet, watch, and jewelry. The Defendant heard the victim get shot with a weapon and went to aid the victim as the victim was bleeding and struggling to breathe.

Lieutenant Kelly testified that, because the Defendant's statement was handwritten, he decided to take a formal statement from the Defendant to establish additional facts. This statement was memorialized in a question and answer format and was admitted into the record as an exhibit and shown to the jury. In the formal statement, the Defendant admitted to being a friend of the victim's and having sexual relations with him in the past. The Defendant stated that he was not present when the victim died but was present when the victim was shot. The Defendant denied being the shooter; he stated that either "Mac," or one of the other men had shot the victim.

In the formal statement, the Defendant stated that the "plan" was for the Defendant to go to the victim's house to get money from him and then let the other men inside the residence so they could rob the victim. The Defendant admitted that he "picked" the victim for the robbery. The Defendant stated that only one gunshot was fired and stated that "Mac" had a handgun and another man, "Kell," had a rifle. The Defendant stated that the group had driven to the victim's residence in a rented Chevy Malibu that was driven by "Kell." The Defendant admitted to seeing a weapon inside the vehicle on the drive over to

5

the victim's residence.   The Defendant stated that he did not take anything from the victim but admitted to driving his vehicle away.   The other men stole a "few" televisions, the victim's cell phone, an Ipad, and a laptop computer.

In the formal statement, the Defendant described again the events of the evening leading up to the victim being shot; his description was largely consistent with his handwritten statement.   The Defendant stated that, after leaving the victim's residence in the victim's car, the Defendant returned to the victim's residence twice during the night.

Outside the presence of the jury, the State informed the trial court that it wished to play the Defendant's jailhouse phone call with the Defendant's mother; the Defendant objected to playing the mother's statements from the call because she would not be made available for cross-examination.   On the recording, her question to the Defendant was, "Why are there photos of [the victim] on your phone?"   The State argued that the statement was highly relevant to show an inference of obstruction of evidence on the part of the Defendant, and additionally that the State had subpoenaed the Defendant's mother to testify.

The trial court ruled that it would allow the Defendant's mother's statement into evidence, on the grounds that it was "very relevant" and not being offered for the truth of the matter asserted but rather, to show the Defendant's state of mind.   The trial court stated that it would instruct the jury on "inference of concealment" or "obstruction of evidence," consistent with Tennessee Pattern Jury Instruction 42.27.   The trial court found that the Defendant's mother was available for cross-examination and thus could be called to testify that she had not seen the photos or that she had not personally done so but heard about them from someone else.   The State played the recording aloud for the jury.

John Panzer, employed as a senior engineer with the University of Memphis, testified that he lived next door to the victim and had a surveillance system on his home at the time of the victim's murder.   Law enforcement knocked on his door the day after the victim's murder and asked to review his camera footage.   Mr. Panzer was able to provide footage from 9 p.m. on December 8th until the following day when the police requested the footage.   The relevant footage was either played for the jury or the jury was shown a still shot of the footage with a timestamp.   Mr. Panzer recalled that he had not met the victim prior to December 8th but had seen the victim's vehicle parked in the driveway.   Mr. Panzer described the vehicle as a bright orange Mustang with a distinctive deep muffler on it.   Mr. Panzer recalled that he went over to the victim's yard on December 8th and introduced himself; their interaction was recorded on the security recording at 9 p.m.   Mr. Panzer informed the victim of the security surveillance system on his house.

Mr. Panzer testified that he had reviewed the security footage from throughout the

night of December 8th and into the early morning of December 9th. The security recording showed a car park on the street near the victim's house at around 1 a.m. and a person exiting the driver's side door. Another individual got out of the vehicle a short time after and stood near the parked vehicle. For the next few hours, the security recording showed four individuals coming and going from the victim's residence. At one point, there was an hour's long "break" in activity on the recording but at 3 a.m. the recording showed an individual running from the victim's residence. The recording showed a vehicle reversing into the victim's driveway and the men loading items into the trunk, including one large item. The vehicle returned to the driveway several times throughout the night until dawn. The victim's vehicle was also shown being driven away, and Mr. Panzer recalled hearing the victim's car start at 6:45 a.m.

Sautonio Crutcher testified that he knew the Defendant through a friend. He testified that the Defendant called him one morning, around 6 a.m., and asked for Mr. Crutcher's help. Mr. Crutcher met up with the Defendant, who arrived driving a bright orange Mustang. The Defendant told Mr. Crutcher it was his new vehicle and offered to take Mr. Crutcher on a drive. Mr. Crutcher declined to go on the drive if the Defendant did not say where they were going. As a precaution, Mr. Crutcher sent a text message to his girlfriend saying that he was with the Defendant should something happen to him. Mr. Crutcher noticed that the vehicle had a license plate, rather than a temporary tag that is typically placed on new cars, and this fact raised a red flag in his mind. Mr. Crutcher identified a handwritten statement he gave to the police on December 20, 2016 following the victim's death.

The trial court then, outside the presence of the jury, discussed which jury instructions it planned to issue to the jury; neither of the parties made any objection to the proposed instructions. The trial court stated that it planned to instruct the jury on the law of flight, based on the video recording of Officer Carlson's stop of the Defendant's vehicle and her subsequent interaction with the Defendant during which he lied about his identity and attempted to evade Officer Carlson when she tried to speak with him. The Defendant then objected to this portion of the instruction and requested that it not be included; the trial court overruled the Defendant's objection and responded that it felt the evidence presented fairly raised proof of flight, stating:

> In looking at the proof, in the video when [Officer Carlson] was behind the [D]efendant, [the Defendant] pulled into a driveway and pretended to know the people in the house and gave a false name to [Officer Carlson], so I think it has been fairly raised in the proof that [the Defendant] left the scene of difficulty and there was a subsequent evasion, because he lied about his name and tried to pull away from the police officer. But, that

7

is up to the jury if they think that is flight.

The trial court proceeded to instruct the jury; the jury instructions are not included in the transcript. Following its deliberations, based upon the evidence presented at the Defendant's trial, the jury returned guilty verdicts on all counts: first degree felony murder in perpetration of a robbery, first degree felony murder in perpetration of a burglary, especially aggravated robbery, aggravated burglary, and employing a firearm during the commission of a dangerous felony. The trial court merged the first degree murder convictions (Counts 1 and 2) and imposed a life sentence for those two convictions. The trial court imposed a concurrent twenty-four-year sentence for the especially aggravated robbery conviction (Count 3). Finally, the trial court imposed consecutive six-year sentences for the aggravated burglary conviction (Count 4) and the employing a firearm during the commission of a dangerous felony conviction (Count 5), for a total effective sentence of life plus twelve years. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant asserts that the trial court erred when it admitted the Defendant's mother's statement into evidence. He also contends that the trial court improperly instructed the jury and that the evidence at trial was insufficient to support his convictions. The State responds that the trial court properly admitted the Defendant's mother's statement. The State further responds that the Defendant has waived his argument regarding the jury instruction because he failed to include the jury instructions in the record on appeal. Finally, the State responds that the evidence is sufficient to support the Defendant's convictions.

### A. The Defendant's Mother's Statement

The Defendant asserts that the trial court erred when it admitted his mother's statement made to him during a jailhouse phone call. He contends that the statement was inadmissible hearsay and should not have been admitted pursuant to the state of mind hearsay exception. He contends that the mother's "state of mind is irrelevant to the case" because her testimony "cannot show the [D]efendant's state of mind." The State responds that the trial court properly determined that the statement was not hearsay because it was not being offered for the truth of the matter asserted. The State argues that the trial court did not classify the statement as hearsay admissible pursuant to an exception and that the same does not apply. The State further responds that, if admitting the statement amounted to error, it was harmless. We agree with the State.

8

The admissibility of evidence rests within the sound discretion of the trial court, and this court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record. *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010). The Tennessee Rules of Evidence provide that all "relevant evidence is admissible," unless excluded by other evidentiary rules or applicable authority. Tenn. R. Evid. 402. Of course, "[e]vidence which is not relevant is not admissible." *Id.* Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Tenn. R. Evid. 801(c).

At trial, the Defendant objected to a recorded telephone call between the Defendant and his mother, during which the mother asked the Defendant, "Why are there photos of that guy, dead on your phone?" and the Defendant responded, "What are you talking about, where did you see it, exactly?" The Defendant argued that his mother was not available for cross-examination regarding her statement, and thus, it was inadmissible hearsay. The Defendant also argued that this evidence raised an issue of bad acts pursuant to Tennessee Rule of Evidence 404(b), namely attempt to conceal or destroy the photographs which were no longer in existence. The Defendant claimed that he had no way of challenging his mother's statement or seeing the photographs that she referenced. The State argued that this evidence did not raise a "404(b) issue" but instead an attempt to destroy evidence, the cell phone photos, which was an inference of guilt.

The trial court stated that the mother's statement made it clear that photos of the victim had been in existence on the Defendant's phone, which the trial court deemed was "extremely relevant." The trial court found that the mother was available to testify and had been present during the trial. The trial court further found that the statement about the photos of the victim was extremely relevant because they showed an inference of concealment since the photos were not part of the trial evidence and presumably were no longer in existence.

The trial court concluded:

. . . I will allow the statement of the mother, because it is not being offered for the truth of the matter asserted, but to show the state of mind of

9

the [D]efendant and whether or not he thought it was true. And, although there is a [Sixth Amendment] constitutional problem with it, to a certain extent, that can be easily cured by the defense, because they can call the mother as a witness to say that she did not see [the photos] on the [Defendant's] phone, that someone else told her it was there, or that she was just saying that, so that is easily remedied and that is a witness [who] is available to the defense, . . . .

We conclude that the trial court did not abuse its discretion when it admitted the mother's question from the recording of the phone call because it was not hearsay. As we have stated, Rule 801(c) defines hearsay as a "statement . . . offered in evidence to prove the truth of the matter asserted." Under Rule 801(a), "[a] 'statement' is (1) an oral or written assertion." Our supreme court noted in *State v. Flood*, 219 S.W.3d 307, 314-15 n.5 (Tenn. 2007), that "questions are often not hearsay because they are not offered to prove the truth of their content[.]" Even if we assume that the Defendant's mother's statement, in the form of a question, was an "assertion" that the Defendant at some point had pictures of the deceased victim on his phone, the mother's statement was not offered to prove the truth of the matter asserted but to provide context to the Defendant's portion of the recorded jailhouse phone call and was thus admissible on that basis. *See, e.g., State v. Kendell Edward Johnson*, No. M2011-00792-CCA-R3-CD, 2012 WL 3731699, at *18-19 (Tenn. Crim. App. Aug. 29, 2012); *State v. George Anthony Bell*, No. M2008-01187-CCA-R3-CD, 2009 WL 3925370, at *6 (Tenn. Crim. App. Nov. 19, 2009); *see also* Neil P. Cohen et al., Tennessee Law of Evidence, § 8.01 [10], 8-27 (6th ed. 2011) ("Statements designed to (1) provide a context for, or (2) permit an understanding of, another statement may not be hearsay.")

The Defendant's mother was nonetheless available to clarify why she asked the question and what she was asserting. The trial court did not abuse its discretion when it concluded that the mother's statement was not hearsay, was relevant and thus admissible. Nevertheless, we note that jailhouse phone call recordings are generally admissible pursuant to the business records exception to the hearsay exclusion rule. *See* Tenn. R. Evid. 803(6); *see also State v. Dustin Shawn Price*, No. M2012-00117-CCA-R3-CD, 2013 WL 4539034, at *7-9 (Tenn. Crim. App., at Nashville, Aug. 26, 2013), *no perm. app. filed*. The Defendant is not entitled to relief on this issue.

### B. Jury Instruction

The Defendant contends that the trial court erred when it instructed the jury by: (1) including the law of flight; (2) correcting the language of the instruction on criminal responsibility after the jury had begun its deliberations; and (3) answering a question posed by the jury during deliberations. The State responds that the Defendant has

10

waived any issue regarding the jury instructions because he failed to include the actual jury instructions in the appellate record. Even so, the State maintains that all of the trial court's actions were proper in light of applicable law. We agree with the State.

## 1. Flight Instruction

Crucially, the Defendant has failed to include the jury instructions in the record on appeal. It is the duty of the appellant to provide a record which conveys a fair, accurate, and complete account of what transpired with regard to the issues which form the basis of the appeal. *See* Tenn. R. App. P. 24(b) ("the appellant shall have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal"); *see State v. Taylor*, 992 S.W.2d 941, 944 (Tenn. 1999). The failure to prepare an adequate record for review of an issue results in a waiver of that issue. *Thompson v. State*, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997). Therefore, this portion of the Defendant's argument is waived.

We now turn to the remaining arguments with regard to the trial court's correction of a mistake in the jury instructions and the trial court's response to a question from the jury. The State contends that these arguments are also waived because the Defendant's failure to include the actual jury instructions renders our review incomplete. While we agree that the Defendant has risked waiver for failing to include the jury instructions in their entirety, *see* Tenn. R. App. P. 24(b), the transcript includes the discussion and the Defendant's resulting objection for these two issues. Thus, in our view, we have sufficient context from which to review them.

A trial court has the duty to fully instruct the jury on the general principles of law relevant to the issues raised by the evidence. *See State v. Burns*, 6 S.W.3d 453, 464 (Tenn. 1999); *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *State v. Elder*, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998). Nothing short of a "'clear and distinct exposition of the law'" satisfies a defendant's constitutional right to trial by jury. *State v. Phipps*, 883 S.W.2d 138, 150 (Tenn. Crim. App. 1994) (quoting *State v. McAfee*, 737 S.W.2d 304 (Tenn. Crim. App. 1987)). In other words, the trial court must instruct the jury on those principles closely and openly connected with the facts before the court, which are necessary for the jury's understanding of the case. *Elder*, 982 S.W.2d at 876. A jury instruction is considered "prejudicially erroneous," only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Stephenson*, 878 S.W.2d 530, 555 (Tenn. 1994)). Because questions regarding the propriety of jury instructions are mixed questions of law and fact, our standard of review here is *de novo*, with no presumption of correctness. *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001); *State v. Smiley*, 38

S.W.3d 521, 524 (Tenn. 2001). Even if a trial court errs when instructing the jury, such instructional error may be found harmless. *State v. Williams*, 977 S.W.2d 101, 104 (Tenn. 1998). Furthermore, an erroneous or inaccurate jury charge, rather than an omitted jury charge, may be raised for the first time in a motion for new trial. *State v. Lynn*, 924 S.W.2d 892, 898-99 (Tenn. 1996) (citing Tenn. R. Crim. P. 30(b)).

## 2. Correction to the Jury Instructions

The Defendant argues that when the trial court issued a correction with regard to the criminal responsibility instruction, it improperly drew the jury's attention to that particular instruction, which was the State's main theory, giving it greater significance. As we previously stated, a trial court has the duty to fully instruct the jury on the general principles of law relevant to the issues raised by the evidence. *See Burns*, 6 S.W.3d at 464. A jury instruction that "fails to fairly submit the legal issues or if it misleads the jury as to the applicable law" is considered erroneous. *See Hodges*, 944 S.W.2d at 352. Special jury instructions may be given "to supply an omission or correct a mistake made in the general charge, to present a material question not treated in the general charge, or to limit, extend, eliminate, or more accurately define a proposition already submitted to the jury." *State v. Cozart*, 54 S.W.3d 242, 245 (Tenn. 2001) *overruled on other grounds*.

Outside the presence of the jury, the trial court informed the parties of two mistakes that had occurred during the instructions given to the jury the previous day. One mistake occurred during the "order of deliberation" instructions and the other during the criminal responsibility instruction. The trial court noted that the pattern instructions for criminal responsibility had recently changed and that the trial court's secretary had inadvertently included the old version of the instruction. The Defendant objected to substituting the updated version, claiming that it would "highlight" the criminal responsibility section and its additional language and would be unfair to the Defendant. The trial court overruled the objection, stating that both the Defendant and the State had a right to a complete and proper charge of the law. In the presence of the jury, the trial court simply asked the jury to "tear out" the pages containing the two erroneous instructions and read to the jury the corrected instructions. The trial court made no other comments about the mistakes or the corrected instructions except to read them aloud. The Defendant claims, however, that because the jury later had a question about the criminal responsibility instruction, special emphasis and attention was clearly put on that portion by the trial court's action.

It is again paramount that the Defendant failed to include the initial jury instruction, precluding our review of the difference in the old versus new criminal responsibility instruction. However, in our view, by issuing the corrected instruction

and thus ensuring that the jury was instructed properly and with updated law, the trial court performed its duty. "To issue an erroneous instruction to the jury would, as we have said, "mislead[] the jury as to the applicable law" and result in prejudicial error. The proper way to correct a mistake in the general charge is to give an additional instruction, which the trial court properly did. *See Cozart*, 54 S.W.3d at 245. We find no error, and the Defendant is not entitled to relief.

### 3. Question from the Jury

The Defendant argues that the trial court improperly answered a question from the jury with regard to criminal responsibility. He contends that, instead of answering the jury's question, the trial court should have reread the instruction and, that by not doing so, the trial court improperly boosted the State's sole theory of the Defendant's guilt.

The question from the jury was as follows: "Should or can we assume that a reference to the Defendant includes, or one [for] whom the Defendant is criminally responsible, even where the [latter] is not explicitly stated?" The trial court's response was, "Yes, anywhere the word defendant appears in element six you can read it as defendant, or one for whom the defendant is criminally responsible." The Defendant objected to the response, maintaining that the proper response was only a rereading of the criminal responsibility instruction.

A trial judge has the authority to give supplemental instructions to the jury in response to a jury question. *State v. Forbes*, 918 S.W.2d 431, 451 (Tenn. Crim. App. 1995). The "appropriate course of action" for a trial court responding to a jury question is to "bring the jurors back into open court, read the supplemental instruction . . . along with a supplemental instruction emphasizing that the jury should not place undue emphasis on the supplemental instructions, and then allow the jury to resume its deliberations." *State v. Bowers*, 77 S.W.3d 776, 791 (Tenn. Crim. App. 2001). A trial court's failure to follow this procedure is subject to harmless error analysis. *See* Tenn. R. App. P. 36(b); *see also Bowers*, 77 S.W.3d at 791 (concluding that the trial court's failure to read the supplemental instruction to the jury in open court and to admonish the jury not to place undue emphasis on the supplemental instruction was harmless).

The State acknowledges that the trial court failed to follow the proper procedure in responding to the jury's question. However, the Defendant bears the burden of establishing that the error was not harmless, and he has failed to explain how the trial court's error "'more probably than not affected the judgment or would result in prejudice to the judicial process.'" *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008) (quoting Tenn. R. App. P. 36(b)). He has not met that burden here, providing no evidence that, even if the jury's attention was drawn especially to the criminal

responsibility instruction, the same more probably than not affected the outcome of its judgment. *Id.* Accordingly, the Defendant is not entitled to relief regarding this issue.

## C. Sufficiency of the Evidence

The Defendant lastly contends that the evidence is insufficient to maintain his convictions for first degree murder, especially aggravated robbery, and aggravated burglary. He contends that he only intended to enter the victim's home, and that, once inside and realizing his accomplices' intent to commit violent acts, he tried to prevent harm to the victim. He further argues that being found driving the victim's vehicle is not evidence of his guilt and that there is no evidence of his intent to commit robbery or burglary. The State responds that the evidence is sufficient from which a jury could conclude that the Defendant shared the criminal intent of these crimes and furthered their commission. The State also responds that the evidence shows that the Defendant stole items from the victim's home as well as his vehicle, sufficient to sustain his convictions for robbery and burglary, and that the victim's death during the commission of these crimes was a result of his overt actions. We agree with the State.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact

from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted). This standard is identical whether the conviction is predicated on direct or circumstantial evidence. *State v. Casper*, 297 S.W.3d 676, 683 (Tenn. 2009); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977). In the absence of direct evidence, a criminal offense may be established entirely by circumstantial evidence. *State v Majors*, 318 S.W.3d 850, 857 (Tenn. 2010) (citing *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973); *Marable v. State*, 313 S.W.2d 451, 456-58 (1958)).

Applicable here, first-degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery or burglary[.]" T.C. A. § 39-13-202(a)(2) (2019). No culpable mental state is required for conviction of felony murder except the intent to commit the underlying felony. *Id.* § 39-13-202(b) (2019). Especially aggravated robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" accomplished with a deadly weapon and where the victim suffers serious bodily injury. *Id.* § 39-14-401, 403 (2019). Burglary is defined as entering a place without the effective consent of the owner with the intent to commit felony, theft, or assault. *Id.* § 39-14-402 (2019). "A

15

person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401. A person is criminally responsible for an offense committed by the conduct of another, if: (2) "Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." T.C.A. § 39-11-402.

The evidence, viewed in the light most favorable to the State, shows that the Defendant knew the victim personally. The Defendant admitted telling his accomplices about the victim when they asked where they could get money. Together with the other men, the Defendant planned to go to the victim's house, gain entry, and take some of the victim's things to sell. Because of their personal relationship, the victim invited the Defendant into his home on the night of December 8, 2016. The Defendant was aware that his accomplices were armed with weapons prior to entering the victim's residence. Inside the victim's residence, the men ransacked it of its contents and stole a television, multiple electronics, and the victim's wallet, watch, and other jewelry. During the robbery, the victim was shot and killed; he was also stabbed multiple times. Following the shooting, the Defendant took the victim's vehicle, along with other items from inside the victim's home, and left the scene driving the victim's car. He returned to the victim's home several times during the hours after the victim was shot. The Defendant later tried to pass off the vehicle as his own new car. This is sufficient evidence from which a jury could rationally conclude that the Defendant was criminally responsible for the victim's murder, which occurred during the commission of the especially aggravated robbery and aggravated burglary and thus is sufficient to support his convictions. The Defendant is not entitled to relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

16